J. Robert Tolman (#003864)
**TOLMAN LAW FIRM**
2173 East Warner Road, Suite 101
Tempe, Arizona 85284
Tel: (480) 625-4501
Fax: (480) 666-9333
robert@rtolmanlaw.com
docketing@rtolmanlaw.com
*Attorney for Plaintiff*

Sean Patrick Tracey (TX Bar No. 20176500)
Shawn P. Fox (TX Bar No. 24040926)
Clinton Casperson (TX Bar No. 24075561)
**TRACEY & FOX LAW FIRM**
440 Louisiana, Suite 1901
Houston, Texas  77002
Tel: (713) 495-2333
Fax: (713) 495-2331
stracey@traceylawfirm.com
sfox@traceylawfirm.com
ccasperson@traceylawfirm.com
*Attorneys for Plaintiff*
*(Pending Pro Hac Vice Application)*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| Erin S. Tafoya, | Case No.: |
|---|---|
| Plaintiff, | **PLAINTIFF'S ORIGINAL COMPLAINT** |
| v. | (Jury Trial Demanded) |
| Ethicon, Inc.; Ethicon Endo-Surgery, Inc.; Ethicon Women's Health and Urology; Karl Storz Endoscopy-America, Inc.; Karl Storz Endovision, Inc.; Karl Storz GmbH & Co. Kg; Gyrus Acmi, Inc.; Gyrus Acmi L.P.; Gyrus Medical Ltd.; Lumenis Ltd.; XIO Group; Lumenis Inc.; Richard Wolf GmbH; Richard Wolf Medical Instruments Corp.; Smith & Nephew PLC; Smith & Nephew Biotherapeutics; Smith & Nephew Inc.; and Smith & Nephew Endoscopy Inc., | |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Erin S. Tafoya, brings her causes of action against Ethicon, Inc., Ethicon Endo-Surgery, Inc., Ethicon Women's Health and Urology, Karl Storz Endoscopy-America, Inc., Karl Storz Endovision, Inc., Karl Storz GmbH & Co. KG, Gyrus Acmi, Inc., Gyrus Acmi, L.P., Gyrus Medical Ltd., Lumenis Ltd., XIO Group, Lumenis Inc., Richard Wolf GmbH, Richard Wolf Medical Instruments Corp., Smith & Nephew PLC, Smith & Nephew Biotherapeutics, Smith & Nephew Inc., and Smith & Nephew Endoscopy Inc., as follows:

### PARTIES

1. Plaintiff, Erin S. Tafoya, is a citizen of Maricopa County, Arizona.

2. Defendant Ethicon, Inc. is a corporation, or other entity, organized and/or existing under the laws of the New Jersey with a principal place of business at 737 U.S. Highway 22, Bridgewater, New Jersey 08807.

3. Defendant Ethicon Endo-Surgery, Inc. is a corporation, or other entity, organized and/or existing under the laws of the Ohio with a principal place of business at 4545 Creek Road, Blue Ash, Ohio 45242.

4. Defendant Ethicon Women's Health and Urology, a division of Ethicon, Inc., a corporate division of Ethicon, Inc., is a corporation, or other entity, organized and/or existing under the laws of the New Jersey with a principal place of business at Route 22 West, Somerville, New Jersey 08876.

5. Defendant Karl Storz Endoscopy-America, Inc. ("KS Endoscopy") is a California corporation with its principal place of business at 2151 E. Grand Avenue, El Segundo, California 90245. Defendant KS Endoscopy may be served with process through its registered agent, Dean Ditto, 2151 E. Grand Avenue, El Segundo, CA, 90245, who is its agent authorized to accept service on its behalf within the State of California.

6. Defendant Karl Storz Endovision, Inc. ("KS Endovision") is a foreign

corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 91 Carpenter Hill Road, Charlton, MA, 01507. Defendant KS Endovision may be served with process through its registered agent, Paracorp Inc., 44 School Street, Room 325, Boston, MA, 02108, who is authorized to accept service on its behalf.

7.     Defendant Karl Storz GmbH & Co. KG, a business entity form unknown, (hereinafter referred to as "Karl Storz") is a foreign entity organized in Germany with its principal place of business at Dr. Karl-Storz-Straβe 34, 78532 Tuttlingen, Germany.  Upon information and belief, Defendant Karl Storz is the parent company of Defendants KS Endoscopy and KS Endovision.  Defendant Karl Storz will be served with process in accordance with the parameters and procedures set forth by the Hague Convention.  At all times relevant herein, Defendant Karl Storz was engaged in the business of designing, manufacturing, marketing, testing, promoting, selling and/or distributing Storz Morcellators in various countries and states including the State of California.

8.     Defendant, Gyrus Acmi, Inc., ("GAI") is a Delaware corporation with its principal place of business in Massachusetts.

9.     Gyrus Acmi, L.P., ("GALP") is a Minnesota limited partnership.  GAI is the limited partner of GALP.  Service may be had by serving their registered agent:  CSC-Lawyers Incorporating Services Company, 221 Bolivar St., Jefferson City, MO 65101.

10.     Defendant, Gyrus Medical Ltd. ("GML") is a business incorporated in Wales. GML is a subsidiary of GAI.

11.      Defendant, Lumenis Ltd, is a foreign company headquartered at Hakidma 6, Yokneam Industrial Park, Yokneam 2069204, Israel.

12.     Defendant, XIO Group, is the holding company of Lumenis Ltd. XIO Group is headquartered at The Shard Suite 1502 32 London Bride Street, London, Greater London SE1

9SG, United Kingdom.

13.    Defendant, Lumenis Inc, is a subsidiary of Lumenis Ltd. Lumenis Inc is located at 3959 West 1820 South, Salt Lake City, Utah 84104.

14.    Defendant, Richard Wolf GmbH, is a foreign entity with its principal place of business at Pforzheimer Strabe 32, Knittlingen, Baden-Wurttemberg 75438, Germany.

15.    Defendant, Richard Wolf Medical Instruments Corp, is a subsidiary of Richard Wolf GmbH headquartered at 353 Corporate Woods Parkway, Vernon Hills, Illinois 60061.

16.    Defendant, Smith & Nephew PLC, is a foreign entity located at 15 Adam Street, London WC2N 6LA, United Kingdom.

17.    Defendant, Smith & Nephew Biotherapeutics, is a subsidiary of SMITH & NEPHEW PLC and is headquartered at 3909 Hulen Street, Fort Worth, Texas 76107.

18.    Defendant, Smith & Nephew Inc, is a subsidiary of Smith & Nephew PLC and is headquartered at 1450 East Brooks Road, Memphis, Tennessee 38116.

19.    Defendant, Smith & Nephew Endoscopy Inc, is a subsidiary of Smith & Nephew PLC, and is headquartered at 150 Minuteman Road, Andover, Massachusetts 01810.

## JURISDICTION AND VENUE

20.    This is a lawsuit for personal injury damages in excess of $75,000.00. The parties are citizens of different states. This Court has diversity jurisdiction pursuant to 28 U.S.C § 1332.

21.    Arizona's long-arm statute provides that its courts may exercise jurisdiction over foreign entities "to the maximum extent permitted by the Arizona Constitution and the United States Constitution." Ariz. R. Civ. P. 4.2(a).

22.    Defendant Ethicon, Inc. at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State

of Arizona.

23.    Defendant Ethicon Endo-Surgery, Inc. at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

24.    Defendant Ethicon Women's Health And Urology, a Division Of Ethicon, Inc., a corporate division of Ethicon, Inc. at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

25.    Defendant Karl Storz Endoscopy-America, Inc. ("KS Endoscopy"), is a California corporation who at all times relevant herein was engaged in the business of manufacturing, marketing, testing, promoting, selling and/or distributing Storz Morcellators in the State of Arizona.

26.    Defendant Karl Storz Endovision, Inc. ("KS Endovision") is a foreign corporation organized and existing under the laws of the Commonwealth of Massachusetts who at all times relevant herein has done and is doing business in Arizona and was engaged in the business of designing, manufacturing, marketing, testing, promoting, selling and/or distributing Storz Morcellators in the State of Arizona.

27.    Defendant Karl Storz GmbH & Co. KG, A Business Entity Form Unknown, (hereinafter referred to as "Karl Storz") is, upon information and belief, the parent company of Defendants KS Endoscopy and KS Endovision. At all times relevant herein, Defendant Karl Storz was engaged in the business of designing, manufacturing, marketing, testing, promoting, selling and/or distributing Storz Morcellators in various countries and states including the State of Arizona.

28.     Defendant, Gyrus Acmi, Inc., ("GAI") at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

29.     Defendant, Gyrus Acmi, L.P. ("GALP") is the limited partner of GAI. GALP at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

30.     Defendant, Gyrus Medical Ltd. ("GML") is a subsidiary of GAI. GML at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

31.     Defendant, Lumenis Ltd, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

32.     Defendant, XIO Group, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

33.     Defendant, Lumenis Inc, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

34.     Defendant, Richard Wolf GmbH, at all times material and relevant hereto was

engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

35.    Defendant, Richard Wolf Medical Instruments Corp, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

36.    Defendant, Smith & Nephew PLC, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

37.    Defendant, Smith & Nephew Biotherapeutics, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

38.    Defendant, Smith & Nephew Inc, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

39.    Defendant, Smith & Nephew Endoscopy Inc, at all times material and relevant hereto was engaged in the business of manufacturing and/or selling and/or supplying and/or marketing and/or designing and/or distributing minimally invasive gynecological surgical products, in the State of Arizona.

40.    As part of Defendants' general sales effort, and as part of the LPM marketing effort, Defendants purposely availed themselves to Arizona and contracted with and/or directly

employed sales representatives to market their products to Arizona doctors.

41. Through the use of sales representatives in Arizona, Defendants established channels to communicate with Arizona doctors, hospitals, and to give advice regarding the use of their products including the LPM.

42. Defendants filled orders for LPMs in the State of Arizona and routinely shipped LPMs into the State of Arizona.

43. Defendants entered into contracts in Arizona, conducted business in Arizona, and as set forth below; committed torts in the state of Arizona.

44. Defendants received payments for the sale of LPMs in Arizona.

45. Prior to 2008, all marketing and strategic decisions regarding the LPM were made by Defendants.

46. Venue is proper in this Court under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona as Plaintiff was diagnosed with uterine cancer in Glendale, Arizona.

47. All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

**FACTUAL ALLEGATIONS**

48. Plaintiff, ERIN S. TAFOYA, underwent a laparoscopic surgical procedure on December 10, 2008 at the Banner Thunderbird Medical Center performed by surgeon, Padmavathy Tummala, M.D. The surgery was performed utilizing a laparoscopic power morcellator ("LPM"), manufactured by Defendants, to morcellate, or cut into small fragments, Plaintiff's uterus.

49. Plaintiff was subsequently diagnosed with a type of uterine cancer. The malignant cells were spread throughout her abdomen and pelvis by the LPM, thereby upstaging her cancer.

50.    The spread of the life-threatening cancer was a direct and proximate result of the use of the LPM.

51.    There was ample literature collected by and known to the Defendants (or should have been known to the Defendants) at or before the time Plaintiff underwent her laparoscopic procedure which discussed and highlighted the risk of disseminating cancer when using the LPM. Defendants knew or should have known that their LPM would disseminate and implant occult malignant tissue fragments in the bodies of women undergoing laparoscopic hysterectomies or myomectomies. For example:

a)    On August 6, 1991, a patent for a Surgical Tissue Bag and Method for Percutaneously Debulking Tissue was issued that describes the potential for laparoscopic power morcellators to disseminate and implant malignant tissue fragments in the body.

b)    The patent for the surgical tissue bag stated: Another problem associated with the debulking, removal or morcellation of large tissue volume is the concern for containing malignant or pathogenic tissue. *The morbidity of patients significantly increases when malignant cells of such large volume tissue are permitted to come in contact with surrounding healthy tissue.* A malignancy would typically indicate a more invasive procedure in which the cavity is opened, and the affected tissue is removed. These invasive open cavity procedures increase the recovery period of the patient and subject the patient to additional discomfort and complications. As a result, the debulking of large malignant tissue volumes percutaneously through an access sheath presents significant morbidity risks to the patient.

c) The patent summary of the invention further stated that, "[C]ontainment of the tissue within the bag also prevents the spread of malignant cells to healthy tissue in the body cavity."

d) The "Surgical Tissue Bag" patent was publicly available and was available to the Defendants, and/or known to Defendants, before they first sought approval of their laparoscopic power morcellators

e) Also, prominent medical journals reporting on laparoscopic power morcellators and the risk of spreading undetected cancer also began to accumulate in the 1990s, and continued thereafter.

f) In 1997, Schneider published a case report in a medical journal, known to the Defendants as The American Journal of Obstetrics and Gynecology, titled "Recurrence of unclassifiable uterine cancer after modified laparoscopic hysterectomy with morcellation," which described a patient who underwent a laparoscopic supracervical hysterectomy by manual morcellation. Schneider, Recurrence of unclassifiable uterine cancer after modified laparoscopic hysterectomy with morcellation, J. AM. OBSTET. GYNECOL., 177(1): 478-9(1997). Common Pleas.

g) The following year, the patient died due to the rapid progression of uterine adenocarcinoma that had been undetected prior to surgery. *Id*. at 478.

h) Schneider cautioned that evaluation for malignancy prior to surgery "grows even more important and should be mandatory when uteri are increasingly morcellated by introduction of laparoscopic techniques." *Id*. at 479.

i)    In 1998, Hutchins and Reinoehl published a case report in THE JOURNAL OF THE AMERICAN ASSOCIATION OF GYNECOLOGIC LAPAROSCOPISTS, which was or should have been known to the Defendants, in which the authors explained that "[b]ecause of the large quantity of tissue of such a uterus, it would be anticipated that numerous fragments would be generated during morcellation." Hutchins and Reinoehl, Retained Myoma after Laparoscopic Supracervical Hysterectomy with Morcellation, J. AM. ASSOC. GYNECOL. LAPAROSC., 5(3):293-295 (1998).

j)    The authors cautioned that the morcellated fragments could become concealed in surrounding organs making it difficult for the surgeon to identify and remove all tissue fragments. *Id*. at 294.

k)    In 2005, LaCoursiere et al. published a case report in THE JOURNAL OF MINIMALLY INVASIVE GYNECOLOGY which reported that "[t]he use of a power morcellator may produce smaller fragments than other techniques." LaCoursiere et al., Retained fragments after total laparoscopic hysterectomy, J. MINIM. INVAS. GYNCOL., 12:67-69, 68 (2005).

l)    According to the authors, "implantation, rather than resorption of residual fragments of cervix and myometrium can occur," a problem which they reported "ha[d] implications for possible benign and malignant sequelae." *Id*.

m)    In 2009, Perri et al published a study and concluded, "In patients with stage I LMS, primary surgery involving tumor injury seems to be associated with a worse prognosis than a total hysterectomy as a primary

intervention." Int. J. Gynecol. Cancer 2009; 19:257-260

n)    Based on this evidence inter alia, Defendants were on notice that their laparoscopic power morcellators exposed patients to a significant risk of disseminating and worsening occult cancer.

52.    Defendants knew or should have known that for women undergoing laparoscopic hysterectomies or myomectomies for presumed fibroids, the risk of having uterine cancer was much higher than the "1 in 10,000" figure commonly provided to patients. For example:

a)    In 1990, Leibsohn et al. published a study titled "Leiomyosarcoma in a series of hysterectomies performed for presumed uterine leiomyomas" in the AMERICAN JOURNAL OF OBSTETRICS & GYNECOLOGY in which the authors found that "…women with signs and symptoms of [benign] uterine leiomyomas [fibroids] that warrant hysterectomy have about a 1 in 140 chance of having a uterine leiomyosarcoma." Leibsohn et al., Leiomyosarcoma in a series of hysterectomies performed for presumed uterine leiomyomas, Am. J. Obstet. Gynecol. 162:968-76, 972 (1990) ("Leibsohn et al. paper") (emphasis added).

b)    In 1999, Takamizawa et al. published another study titled "Risk of Complications and Uterine Malignancies in Women Undergoing Hysterectomy for Presumed Benign Leiomyomas" in GYNECOLOGIC AND OBSTETRIC INVESTIGATION, which found that 2/923 women who underwent hysterectomies for presumed benign fibroids had undiagnosable hidden sarcomas before their hysterectomies. Takamizawa et al., Risk of Complications and Uterine Malignancies in    Women    Undergoing    Hysterectomy    for    Presumed    Benign

Leiomyomas, GYNECOL. OBSTET. INVEST., 48:193-196, 196 (1999).

c) Takamizawa et al. reported that their study results were consistent with the findings of other studies which suggested that 2–5 patients per 1,000 who undergo surgery for presumed fibroids have uterine sarcomas. Id.

d) This evidence was *inter alia* available to Defendants.

e) However, on information and belief, in seeking approval for their laparoscopic power morcellators decades before Plaintiff underwent surgery, and later when promoting their devices to the medical community, Plaintiff and Plaintiff's surgeon, Defendants ignored this data and touted a much lower 1 in 10,000 risk.

53. Defendants knew or should have known that women could not adequately be screened for malignancy prior to undergoing LPM surgery because certain types of cancers, including sarcomas, can mimic the radiographic appearance of benign uterine fibroids and do not always yield a positive biopsy result upon sampling. For example:

a) In the 1990, Leibsohn et al. study, discussed *supra,* the authors described the difficulties in diagnosing leiomyosarcoma preoperatively, noting that "abdominal ultrasonography of the pelvis and cervical cytology are not helpful preoperative tests for the diagnosis [of] leiomyosarcoma of the uterus." See Leibsohn et al. paper, at 192.

b) Additional evidence became available to Defendants in 2001, when Stewart published an article in THE LANCET, which explained that malignant leiomyosarcoma and benign fibroids may share histological features; thereby, making it more difficult for clinicians to identify the malignant potential of smooth muscle uterine tumors. Stewart, Uterine Fibroids, THE LANCET, 357:293-98 (2001).

c) The difficulty in diagnosing uterine cancer preoperatively was not limited to leiomyosarcoma.

d) In 2008, Bansal et al. published a study in GYNECOLOGIC ONCOLOGY, in which the authors found that the predictive value of endometrial biopsy or curettage for diagnosing uterine sarcoma was very poor and thus "novel diagnostic techniques are needed to accurately identify uterine sarcomas preoperatively." Bansal et al., The utility of preoperative endometrial sampling for the detection of uterine sarcoma, GNECOL. ONCOL., 110:43-48, 47 (2008).

e) According to the authors, where malignancy is found before surgery, the standard treatment for uterine cancer is a total hysterectomy with staging of the cancer, not tissue morcellation. *Id*.

54. Defendants knew or should have known that women undergoing surgery with an LPM suffer worse long-term medical outcomes than women undergoing other available treatment options because of the cancer risks associated with the use of these devices. For example:

a) In 2002, Goto et al. published a study in the INTERNATIONAL JOURNAL OF GYNECOLOGIC CANCER, which reported: "Leiomyosarcoma of the uterus is one of the most difficult neoplasms to cure in gynecologic oncology. Its malignant behaviors such as rapid growth and high rate of metastasis are notorious. The 5-year survival in patients with advanced stages (stage III or higher) is less than 10%, although leiomyosarcoma resembles leiomyoma in clinical features. Until now LMS was diagnosed only in advanced stages or accidentally at

total abdominal hysterectomy.[…]Therefore it seems that the effective treatment of LMS is surgical removal of the tumor in the earlier stages. The problem regarding treatment of LMS is the difficult preoperative differential diagnosis of LMS in the early stages from leiomyoma, which is the most common tumor of the uterus." Goto. et al., INT. J. GYNECOL.CANCER, 12:354-361, 358 (2002).

b) Likewise, in 2003, Morice et al. published an article in the EUROPEAN JOURNAL OF GYNECOLOGIC ONCOLOGY, in which they found a substantial increase in pelvic recurrence of uterine sarcoma at three (3) months in 34 patients with uterine sarcoma who had morcellation during their initial surgery compared with 89 patients without morcellation. Morice et al., Prognostic value of initial surgical procedure for patients with uterine sarcoma:  analysis of 123 patients, EUR.  J.GYNAECOL. ONCOL., 24(3-4); 237-40, 238-39 (2003).

c) In 2008, Einstein et al. presented a prospective study in the INTERNATIONAL JOURNAL OF GYNECOLOGIC CANCER involving all patients who had undergone any type of hysterectomy for presumed benign disease and were, subsequently, referred to Memorial Sloan-Kettering between January 2000 and March 2006 with diagnosed malignancy based on the final surgical pathology. Einstein et al., Management of uterine malignancy found incidentally after supracervical hysterectomy or uterine morcellation for presumed benign disease, INT. J.GYNECOL. CANCER, 18: 1065-70, 1066 (2008).

d) According to their review, an astounding 40% percent of patients who underwent morcellation were found to have upstaged cancer compared

with only 8% who had a supracervical hysterectomy. *Id*. at 1069.

e)   According to the authors, "[this] data support this trend toward worse outcomes in patients who had morcellation procedures." *Id*.

f)   In 2009, Perri et al. published an article in the INTERNATIONAL JOURNAL OF GYNECOLOGICAL CANCER, in which they explained: [u]nfortunately, however, it is not unusual to diagnose LMS [leiomyosarcoma] only postoperatively because its symptoms and signs resemble those of benign leiomyomas (LMs), and there are no imaging techniques for differentiation between the two. Consequently, on the assumption that they have LM, some patients with LMS are treated initially with hysteroscopic or abdominal myomectomy, subtotal hysterectomy, or laparoscopic hysterectomy or myomectomy with a morcellator knife. Those surgical techniques, unlike total abdominal hysterectomy (TAH), are likely to involve tumor injury or cut-through. Perri et al., Uterine Leiomyosarcoma: Does the Primary Surgical Procedure Matter?, INT. J. GYNECOL. CANCER, 19(2): 257- 260, 257 (2009).

(g)   According to the authors, "[their] data demonstrate[d] a significant disadvantage for patients in whom the primary surgery had involved tumor cut-through." *Id*. at 260.

55.   Defendants knew or should have known that when malignant tissue undergoes Laparoscopic Power Morcellation, the resultant tissue specimens can delay diagnosis because the tissue's ground up condition can prevent the pathologist from properly identifying and staging cancer, which can further worsen a patient's prognosis and treatment outcomes. For example:

a) In 2005, Rekha et al. discuss in their paper published in the AUSTRALIAN AND NEW ZEALAND JOURNAL OF OBSTETRICS AND GYNAECOLOGY, "[o]ne of the disadvantages of tissue morcellation is loss of the gross appearance of the specimen and the possibility of missing the most suspicious area for the microscopic evaluation." Rekha et al., Unexpected complications of uterine myoma morcellation, Aust. N.Z. J. Obstet. Gynecol., 45: 248- 49, 248 (2005).

b) Rekha et al.'s case report involved a 40-year-old woman who underwent total laparoscopic hysterectomy for presumed benign uterine fibroids died several months after her initial surgery from dissemination of occult leiomyosarcoma. *Id*.

c) According to the authors, the patient's "malignant component was missed at the time of initial histological evaluation due to evaluation of limited tissue." *Id*.

56. Indeed, morcellated specimens are poorly amenable to pathologic examination, because the morcellation abolishes many of the anatomic features that allow for meaningful gross description, including the notions of orientation, dimension, adjacency, border, and margin.

57. As set forth herein, there were numerous journal articles and published studies available to the Defendants examining an LPMs' potential to spread and worsen a woman's occult cancer. This evidence should have placed Defendants on notice that their LPMs were associated with and/or would cause the dissemination and upstaging of a woman's occult cancer.

58. On April 17, 2014, the FDA issued a safety communication discouraging the use of laparoscopic power morcellation during hysterectomy or myomectomy surgical procedures

for uterine fibroids.  The FDA announced, "If laparoscopic power morcellation is performed in women with unsuspected uterine sarcoma, there is a risk that the procedure will spread the cancerous tissue within the abdomen and pelvis, significantly worsening the patient's likelihood of long-term survival." The FDA discouraged this practice because of this risk and the fact that "there is no reliable method for predicting whether a women with fibroids may have a uterine sarcoma."

59.    Based on the FDA safety communication released in 2014, another manufacturer, Johnson & Johnson, suspended worldwide sales of their LPMs and later removed these devices altogether. Their reasoning was sound, if not overdue: "The risk-benefit assessment associated with the use of these devices in hysterectomy and myomectomy procedures for removing fibroids remains uncertain." The FDA further warned that based on an "FDA  analysis  of currently available data, it is estimated that **1 in 350 women undergoing hysterectomy or myomectomy  for  the  treatment  of  fibroids  is  found  to have  an  unsuspected  uterine  sarcoma.**" *Id*. (emphasis added).

60.    Significantly, in its "Quantitative Assessment of the Prevalence of Unsuspected Uterine Sarcoma in Women Undergoing Treatment of Uterine Fibroids," the FDA listed the studies upon which it relied in reaching its conclusions on the prevalence of unsuspected uterine cancers.

61.    The studies cited by the FDA were published in prominent medical journals, ranging in publication date from 1980 to 2014.  Significantly, the majority of the studies cited by the FDA were available to Defendants **prior to the date on which Plaintiff Erin S. Tafoya underwent her surgery**.

62.    In 2014, FDA identified the following studies as relevant to the prevalence of uterine cancer in the setting of presumed benign fibroid. Five (5) studies identified by FDA predate Ms. Tafoya's procedure:

**Table 2. Studies reporting unsuspected uterine sarcomas and LMS, 1980-March, 2014+**
**(Rates are per 1,000 patients)**

| Author | Year Published | Study Years | Procedure(s) | Total Patients | Number of Uterine Sarcomas | Rate of Uterine Sarcoma (95%CI) | Number LMS | Rate of LMS (95% CI) |
|---|---|---|---|---|---|---|---|---|
| Leibsohn[35] | 1990 | 1983-1988 | Hysterectomy | 1429 | 7 | 4.90 (1.97-10.07) | 7 | 4.90 (1.97-10.07) |
| Reiter[36] | 1992 | 1986-1989 | Hysterectomy | 104 | 0 | 0.00 (0.00-34.85) | 0 | 0.00 (0.00-34.85) |
| Parker[37] | 1994 | 1988-1992 | Hysterectomy or Myomectomy | 1332 | 3 | 2.25 (0.47-6.57) | 1 | 0.75 (0.02-4.18) |
| Takamizawa[38] | 1999 | 1983-1997 | Hysterectomy | 923 | 2 | 2.17 (0.26-7.81) | 1 | 1.08 (0.03-6.02) |
| Sinha[39] | 2008 | 1998-2005 | Myomectomy | 505 | 2 | 3.96 (0.48-14.23) | 2 | 3.96 (0.48-14.23) |
| Kamikabeya[40] | 2010 | 1987-2008 | Hysterectomy | 1364 | 2 | 1.47 (0.18-5.29) | 1 | 0.73 (0.02-4.08) |
| Rowland[41] | 2011 | 2006-2011 | Hysterectomy | 1115 | 5 | 4.48 (1.46-10.43) | 3 | 2.69 (0.56-7.84) |
| Leung[42] | 2012 | 1999-2005 | Hysterectomy | 1297 | 3 | 2.31 (0.48-6.75) | 3 | 2.31 (0.48-6.75) |
| Seidman[43] | 2012 | 2005-2010 | Myomectomy | 1091 | 2 | 1.83 (0.22-6.61) | 1 | 0.92 (0.02-5.10) |

**Table 4. Outcomes after morcellation of an unsuspected tumor, 1980-March, 2014**

| Author | Year Published | Study Years | Study Design | Total Number Patients | Procedure | Cancer/Neoplasms | Outcome(s) |
|---|---|---|---|---|---|---|---|
| Monce[46] | 2003 | 1977-1997 | Retrospective cohort study | 123 | Morcellation versus no morcellation | Leiomyosarcoma, Endometrial stromal sarcoma Carcinosarcoma | Recurrence Disease-Free Survival Overall Survival |
| Park[47] | 2011 | 1989-2010 | Retrospective cohort study | 56 | Morcellation versus total abdominal hysterectomy | Leiomyosarcoma | Recurrence Disease-Free Survival Overall Survival |
| Park[48] | 2011 | 1989-2010 | Retrospective cohort study | 50 | Morcellation versus total abdominal hysterectomy | Endometrial stromal sarcoma | Recurrence Disease-Free Survival Overall Survival |
| Seidman[43] | 2012 | 2005-2010 | Descriptive chart review | 14 | Morcellation only | Leiomyosarcoma, Endometrial stromal sarcoma STUMP± Cellular leiomyoma Atypical leiomyoma | Mortality |
| Oduyebo[44] | 2014 | 2005-2012 | Descriptive chart review | 21 | Morcellation only | Leiomyosarcoma STUMP± | Recurrence Mortality |
| George[49] | 2014 | 2007-2012 | Retrospective cohort study | 58 | Morcellation versus total abdominal hysterectomy | Leiomyosarcoma | Recurrence Disease-Free Survival Overall Survival |

*One patient also had ovarian cancer
± Smooth muscle Tumor of Uncertain Malignant Potential

63.    In 2008, the findings in the published medical literature on the prevalence of uterine cancer in the setting of presumed benign fibroid, and the outcomes of morcellated cancer constituted a safety signal.

64.    On July 10 and 11 of 2014, the FDA convened an Advisory Committee meeting of the Obstetrics and Gynecological Medical Device Advisory Committee on LPMs to discuss, among other topics, "whether a 'boxed warning' related to the risk of cancer spread should be required for Laparoscopic Power Morcellators."

65.    On November 24, 2014, the FDA updated its prior safety communication

regarding power morcellators. Rather than merely discouraging power morcellation in the treatment of uterine fibroids, the FDA warned against "the use of Laparoscopic Power Morcellators in the majority of women undergoing myomectomy or hysterectomy for treatment of fibroids."

66.     In its warning, the FDA stated, "[I]f laparoscopic power morcellation is performed in women with unsuspected uterine sarcoma, there is a risk that the procedure will spread the cancerous tissue within the abdomen and pelvis, significantly worsening the patient's long-term survival." According to the Safety Communication, the FDA, in an unprecedented action, issued, an Immediately In Effect ("IIE") guidance that asked manufacturers of LPMs to include two contraindications and a boxed warning in its product labeling. Said warning advised the medical community against using LPMs in the majority of women undergoing myomectomy or hysterectomy, and recommended that doctors share this information with their patients.

67.     A boxed warning is the strongest warning the FDA implements for medical devices. Upon information and belief, this is the first time the FDA has used its IIE authority to warn the public about a product.

68.     Recognizing that LPMs pose a heightened risk of spreading cancerous tissue within the abdomen and pelvis, the FDA recommended that manufacturers of LPMs prominently include the following contraindications and boxed warning in their product labeling:

> **CONTRAINDICATION: Laparoscopic Power Morcellators are contraindicated in gynecologic surgery in which the tissue to be morcellated is known or suspected to contain malignancy.**

> **CONTRAINDICATION: Laparoscopic Power Morcellators are contraindicated for removal of uterine tissue containing suspected fibroids in patients who are:**
> - **Peri- or post menopausal, or**

- ***Candidates for en bloc tissue removal, For example:
  through the vagina or via a mini-laparotomy incision.***

> *WARNING:* **Uterine tissue may contain unsuspected cancer. The use of Laparoscopic Power Morcellators during fibroid surgery may spread cancer, and decrease the long-term survival of patients.  This information should be shared with patients when considering surgery with the use of these devices.**

69.    The information forming the basis of the 2014 label change was known, or knowable in 2008, because the majority of the literature reviewed by FDA pre-dated Mrs. Tafoya's procedure.

70.    The state of scientific knowledge in 2008 regarding the use of power morcellation in the setting of presumed benign fibroid warranted contraindicating the device in peri/post menopausal women; or candidates for *en bloc* removal.

71.    The state of scientific knowledge in 2008 regarding the use of power morcellation in the setting of presumed benign fibroid warranted a warning that power morcellation during fibroid surgery may spread cancer and decrease the long-term survival of patients.

72.    The state of scientific knowledge in 2008, and before, regarding the use of power morcellation in the setting of presumed benign fibroid warranted the development of tissue containment systems through CAPA, or other applicable safety protocols, to mitigate the risk of tissue spread.

73.    LPMs are not necessary for the treatment of uterine fibroids.  Safer, more reasonable and feasible alternative methods that do not employ the use of an LPM have existed for decades for treating uterine fibroids.  For example, other surgical methods have long been widely used, and are still used, for the safe removal of the uterus and uterine fibroids including, but not limited to, vaginal hysterectomies and abdominal hysterectomies whereby the uterus can be removed intact rather than being fragmented by an LPM in such a way that cancer cells

are disseminated, seeded and spread throughout the abdomen.

74. Further, minimally invasive techniques were available in 2008 that avoid power morcellation that could be utilized to safely perform a hysterectomy. Such techniques include, but are not limited to, mini laparotomy, LAVH, and TLH.

75. Defendants marketed and over promoted the LPM as a safer morcellator than competitor morcellators. Specifically, Defendants represented to the surgical community the cutting mechanism of LPM reduced the risk of tissue seeding.

76. This representation was baseless as, in 2014, ACOG provided "There are some power morcellators that rely on electrical current rather than a rotating blade to shave tissue, and there are no studies on whether this mitigates the possibility of tissue dissemination."

**The Use of the LPM In Erin S. Tafoya's Surgery**

77. At the time of her hysterectomy procedure Mrs. Tafoya was 49 years old, peri-post menopausal and a candidate for en bloc removal.

78. The presumably benign fibroid tissue removed by Erin S. Tafoya's physician was in fact an incurable and aggressive form of uterine cancer. In cutting, shredding and fragmenting the uterus while still within Erin S. Tafoya, the LPM disseminated and seeded the cancer throughout her pelvis and abdominal cavity thereby worsening her long-term prognosis and the natural course of her cancer.

79. Erin S. Tafoya has undergone chemotherapy and surgical treatment in an attempt to slow the progression of her disease. Erin S. Tafoya continues to undergo chemotherapy in an attempt to monitor the progression of her disease and preserve quality of life. Erin S. Tafoya's uterine cancer is highly aggressive and incurable.

**DISCOVERY RULE, TOLLING AND FRAUDULENT CONCEALMENT**

80. Plaintiff incorporates by reference all of the above paragraphs as if set forth in

full herein.

81.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injuries, and the tortious nature of the wrongdoing that caused the injuries.

82.     Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Erin S. Tafoya's medical providers, the nature of Plaintiff's injuries and damages, and their relationship to the LPM was not discovered, and through reasonable care and due diligence could not have been discovered, until a date shortly prior to the filing of Plaintiff's claims.  Therefore, under the appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

83.     The running of the statute of limitations in this cause is tolled due to equitable tolling.  Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and Erin S. Tafoya's physicians who were unaware of the true risks associated with the use of the LPM.  As a result of Defendants' fraudulent concealment, Plaintiff was unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

84.  Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from Plaintiff and her physicians the nature of their injuries and the connection between the injuries and Defendants' tortious conduct.

/ / /

/ / /

/ / /

**– COUNT ONE –**
**STRICT PRODUCT LIABILITY**
**FAILURE TO WARN AND INSTRUCT AGAINST ALL DEFENDANTS**

85.     Plaintiff incorporates by reference all of the above paragraphs as if set forth in full herein.

86.     Defendants are distributors, marketers, and sellers of the LPM.

87.     Defendants placed LPMs into the stream of commerce in the course of their business.

88.     Defendants transferred and sold the LPM used on Plaintiff, and others, in the course of their business.

89.     The LPM reached end users in Arizona in sealed containers and in the same condition as when sold.

90.     The LPM was unreasonably dangerous at the time of sale when used as reasonably anticipated.

91.     Plaintiff's healthcare providers did not alter the LPM.

92.     Plaintiff's healthcare providers used the LPM for its intended use and in a manner reasonably anticipated.

93.     The LPM did not function as intended and malfunctioned as the LPM disseminated malignant tissue throughout Plaintiff's peritoneum and resulted in spreading and upstaging of her Endometrial Cancer.

94.     The LPM failed to perform in the manner reasonably to be expected in light of its nature and intended function as the device disseminated malignant tissue throughout her peritoneum and resulted in spread and upstaging of her uterine cancer.

95.     The Instructions for Use for the LPM, which accompanied the product, was distributed by Defendants and used in connection with their marketing efforts.

96.     The LPM Instructions for Use were inadequate and defective in the following

particulars:

a)  Failing to contraindicate the device in peri/post-menopausal women;

b)  Failing to contraindicate the device in women who were candidates for *en bloc* removal;

c)  Failing to disclose the limitations of pre-operative diagnosis of uterine cancer;

d)  Failing to disclose a prevalence rate of uterine cancer of 1/500 in the setting of presumed benign fibroid;

e)  Failing to disclose that morcellation of unsuspected malignancy worsens prognosis.

97.  The above inadequacies rendered the LPM unreasonably dangerous and defective when put to its anticipated use as a surgical tool during hysterectomy procedure.

98.  Plaintiff's healthcare providers relied on the Instruction for Use distributed by Defendants.

99.  Plaintiff's healthcare providers were without knowledge of the dangerous characteristics of the LPM.

100.  Had Plaintiff's healthcare providers been given adequate warnings and instructions, they would not have utilized the LPM during her procedure as the device would be contraindicated for use with Plaintiff due to her age.

101.  As a direct and proximate result of the inadequate and defective warnings disseminated by Defendants as set forth above, Erin S. Tafoya was treated with the LPM, and as a result Plaintiff suffered, and continue to suffer, the injuries and damages as set forth herein.

/ / /

/ / /

/ / /

### – COUNT TWO –
### STRICT PRODUCT LIABILITY
### DESIGN DEFECT AGAINST ALL DEFENDANTS

102.    Plaintiff incorporates by reference all of the above paragraphs as if set forth in full herein.

103.    Defendants are distributors, marketers, and sellers of the LPM.

104.    Defendants placed the LPM into the stream of commerce in the course of their business.

105.    The LPM reached end users in Arizona in sealed containers and in the same condition as when sold.

106.    Defendants transferred and sold the LPM used on Plaintiff, and others, in the course of their business.

107.    The LPM sold and distributed by Defendants was defective in design at the time of sale and unreasonably dangerous in the following ways, but not limited to:

    a)    Defective in design because it can upstage, disseminate and seed malignant and nonmalignant cells and tissue;

    b)    Defective in design and was not reasonably safe as intended to be used, subjecting Plaintiff to risks which exceeded the benefits of the LPM;

    c)    Defective in design, making use of the LPM more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with Plaintiff's underlying condition;

    d)    Defective in design, making use of the LPM more dangerous than the ordinary consumer would expect and more dangerous than other risks associated with like products;

108.    Erin S. Tafoya was injured as result of the above described defects in that the LPM spread malignant tissue throughout her pelvis and abdomen.

109.   The above described defects rendered the product unreasonably dangerous for its intended use.

110.   Plaintiff's healthcare providers did not alter the LPM and used the LPM for its intended use and in a reasonably anticipated use.

111.   Erin S. Tafoya was morcellated by the LPM in an open setting and without the use of a tissue containment system.

112.   A tissue containment system is a safety feature which reduces the risk of peritoneal spread of malignant cells during power morcellation.

113.   A tissue containment system is a plastic barrier which, when insufflated, conforms to the contours of the patients abdomen.  Morcellation is performed within the containment bag and the entire bag, including the specimen removed.

114.   There was no scientific, engineering, or technical barrier to creating a Tissue Containment System for use in connection with the LPM in January 2008.

115.   The LPM was capable of being made safer in 2008 through use of Tissue Containment System to mitigate the risk of tissue spread.

116.   The absence of a tissue containment system rendered the LPM defective and unreasonably dangerous in design.

117.   Had Erin S. Tafoya's, procedure utilized a tissue containment system and morcellation been performed in a closed environment, malignant tissue and cells would not have been disbursed throughout her abdomen and pelvis.

118.   Erin S. Tafoya, through her treating physicians, used the LPM for its intended purpose and could not have discovered any defect therein through the exercise of due care.

119.   As a direct and proximate result of the defects in the design of the LPM sold and distributed by of Defendants as set forth above, Erin S. Tafoya was treated with the LPM, and as a result, Plaintiff suffered and continue to suffer injuries and damages as set forth herein.

**– COUNT THREE –**
**NEGLIGENT MISREPRESENTATION and**
**FRAUD AGAINST DEFENDANTS**

120. Plaintiff incorporates by reference all of the above paragraphs as if set forth in full herein.

121. As part of the marketing effort regarding the LPM, Defendants created programs to train physicians on the use of the LPM.

122. As part of the marketing effort regarding the LPM, Defendants utilized sales representatives to market the device to doctors.

123. At all relevant times, Defendants had control over the materials used by sales representatives, and representations made at sponsored physician training.

124. At all relevant times, Defendants had control over the content of marketing materials.

125. Defendants trained physicians, including Plaintiff's healthcare providers, that the LPM "reduced the chance of sequelae seeding."

126. Defendants marketed the LPM to Plaintiff's healthcare providers as having a "reduced the chance of sequelae seeding."

127. The representations were false and misleading and not based on valid science.

128. The representations were negligently made and were done with the intent healthcare providers, including Ms. Tafoya's healthcare providers, rely on it.

129. Further, this representation was intentionally made with knowledge of its falsity and/or ignorance of its truth, and with the intent that healthcare providers, including Ms. Tafoya's healthcare providers, rely upon it.

130. These representations were made in the course of the business of Defendants.

131. Defendants made this false representation with a profit seeking motive and with

the intent to generate sales of their product by falsely claiming it was safer than the competition.

132.    This representation was made, by sales representatives and/or at physician training events, to Plaintiff's healthcare providers prior to the date of Ms. Tafoya's procedure.

133.    Plaintiff's healthcare providers relied on this representation in the selecting the LPM for Plaintiff's procedure.

134.    Plaintiff's healthcare providers had a right to rely on the truthfulness of representations made by Defendants concerning the safety of the LPM.

135.    Plaintiff's healthcare providers were ignorant of the falsity of the representation that the LPM reduced the risk of seeding.

136.    In 2014, ACOG provided "There are some power morcellators that rely on electrical current rather than a rotating blade to shave tissue, and there are no studies on whether this mitigates the possibility of tissue dissemination."

137.    Had Plaintiff, or her healthcare providers, known there were no studies verifying the representations made by Defendants, they would not have used the device during her hysterectomy, or relied on the statements as true.

138.    This negligent/intentional misrepresentation regarding the LPM was a direct and proximate cause of Plaintiff's injuries. As a direct and proximate result of the representations of DEFENDANTS as set forth above, Plaintiff suffered, and will continue to suffer into the future, injuries and damages, as set forth herein.

**– COUNT FOUR –**
**NEGLIGENT UNDERTAKING AND TRAINING**

139.    Plaintiff incorporates by reference all of the above paragraphs as if set forth in full herein.

140.    Defendants are liable to Plaintiff under state common law and/or Restatement

(Second) of Torts § 324A (1965) due to their negligent training, advising and instructing of the physicians who use the LPM in their surgical procedures.

141. The Defendants trained, advised, and instructed physicians in using the LPM in their surgical procedures. The training, advising and instructing of the physicians was done because it was necessary for the protection of patients such as Erin S. Tafoya.

142. However, Defendants failed to exercise reasonable care in training, advising, and instructing these physicians because Defendants never undertook to train these physicians on the risks and dangers associated with upstaging, disseminating and seeding of malignant cells by the LPM. Their failure to undertake these matters with reasonable care increased the risk of harm to patients such as Erin S. Tafoya.

143. Specifically, Defendants negligence includes but is not limited to the following:

a) Failing to train medical community, physicians, Erin S. Tafoya and her physicians with adequate and clinically relevant information, and data and warnings regarding the adverse health risks associated with the use of the LPM, including the risk that the LPM can upstage, disseminate and seed malignant cells; and/or that there existed safer and more or equally effective alternative products;

b) Failing to train the medical community, physicians, Erin S. Tafoya and her physicians on the known, or knowable, prevalence of LMS in the setting of presumed benign fibroid;

c) Failing to train the medical community, physicians, Erin S. Tafoya and her physicians on the limitations of pre-operative testing to detect a uterine sarcoma;

d) Failing to train the medical community, physicians, Erin S. Tafoya and her physicians on the increasing risk of leiomyosarcoma with increased

age and menopausal status; and

e)   Failing to train the medical community, physicians, Erin S. Tafoya and her physicians on proper patient selection;

144.   As a direct and proximate result of the negligent acts and/or omissions of the Defendants, Plaintiff suffered injuries and damages, as set forth herein.

## – COUNT FIVE –
## NEGLIGENT FAILURE TO WARN AGAINST ALL DEFENDANTS

145.   Defendants are liable under Restatement (Second) of Torts § 388.

146.   At all relevant times, Defendants employed sales representatives to market the LPM to Plaintiff's healthcare providers.

147.   At all relevant times, Defendants owed a duty of reasonable care to provide healthcare providers with adequate warnings regarding the use of the LPM.

148.   By 2008, there existed sufficient published data regarding the prevalence of LMS, and outcomes of morcellated LMS, to constitute a safety signal.

149.   Defendants knew, or had reason to know, the LPM was likely to be dangerous for its intended use.

150.   Defendants had no reason to believe that Plaintiff's healthcare providers would realize the dangers posed by intended use of the LPM.

151.   In light of the safety signal which existed by 2008, Defendants negligently failed to provide doctors and hospitals with adequate warnings.

152.   As a direct and proximate result of this failure, Plaintiff's healthcare providers selected the LPM for her procedure which resulted in the injuries set forth herein.

## DAMAGES

153.   Plaintiff would show that as a proximate result of defects in the product and negligence of Defendants, Plaintiff has suffered serious and disabling injuries of a permanent

nature, including the following:

   a)  Loss of earnings, household services, and fringe benefits in the past. Likewise, the disability from which she now suffers and will, in all reasonable medical probability, continue to suffer for the rest of her life, has caused her earning capacity and ability to perform household services to be permanently and materially diminished in the future;

   b)  Plaintiff has suffered great physical pain and mental anguish in the past, and in all reasonable medical probability, will continue to suffer, on a permanent basis, great physical pain and mental anguish in the future;

   c)  As a result of the injuries which Plaintiff sustained, she has been afflicted with a substantial degree of physical impairment which, in all reasonable medical probability, is permanent;

   d)  Plaintiff has suffered loss of enjoyment of life as a result of the injuries incurred and will continue to suffer loss of enjoyment of life in the future;

   e)  Plaintiff has suffered disfigurement as a result of the injuries incurred and will continue to suffer disfigurement in the future; and

   f)  Plaintiff has also been forced to incur expenses for medical and hospital care as a direct result of the injuries complained of herein, and in all reasonable medical probability, as a result of the injuries complained of herein, she will continue to incur medical and hospital expenses for the remainder of her lifetime.

## **JURY DEMAND**

138.   Plaintiff demands that all issues of fact in this case be tried to a properly empaneled jury.

/ / /

## CONCLUSION AND PRAYER

WHEREFORE, Plaintiff requests trial by jury and that the Court grants her the following relief against the Defendants, on all counts of this Complaint, including:

a)      Money Damages representing fair, just, and reasonable compensation for their respective common law and statutory claims in excess of $75,000.00;

b)      Punitive and/or Treble Damages pursuant to state law;

c)      Attorneys' fees pursuant to state law;

d)      Pre-judgment and post-judgment interests as authorized by law on the judgments which enter on Plaintiff's behalf;

e)      Costs of suit and expenses;

f)      Delay Damages; and

g)      Such other relief as is deemed just and appropriate.

DATED:  January 25, 2019          Respectfully submitted,

**TOLMAN LAW FIRM**

By /s/J. Robert Tolman
    J. Robert Tolman
    2173 East Warner Road, Suite 101
    Tempe, Arizona 85284

*Attorney for Plaintiff*

-and-

Sean Patrick Tracey
Shawn P. Fox
Clinton Casperson
**TRACEY & FOX LAW FIRM**
440 Louisiana, Suite 1901
Houston, Texas  77002

*Attorneys for Plaintiff*
*(Pending Pro Hac Vice Application)*